IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

IN THE MATTER OF THE SEARCH OF
AN APPLE IPHONE SEIZED FROM
JOE L. FLETCHER III

Case No._____ 5:20mj1278

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Clay R. McCausland, Special Agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Department of Justice, being duly sworn under oath, herby deposes and states:

### INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.  I am a law enforcement officer of the United States, and under 18 U.S.C. § 3051.  I am empowered by the Attorney General to conduct investigations, enforce criminal, seizure, and forfeiture provisions of the laws of the United States, carry firearms, serve warrants and subpoenas issued under the authority of the United States, make arrests without a warrant for any offense against the United States committed in my presence, and make arrests for a felony offense under the laws of the United States if there are reasonable grounds to believe that the person to be arrested has committed or is committing such a felony.

1

3.   I am employed as a Special Agent with ATF and have been so since October 2015. I am presently assigned to ATF's Cleveland Field Office. I am a graduate of the ATF National Academy, located at the Federal Law Enforcement Training Center in Glynco, Georgia. The ATF National Academy consists of 16 weeks of training regarding subjects such as firearms trafficking, unlawful possession of firearms, unlawful dealing in firearms, unlawful possession and/or use of explosives, improvised explosive devices, arson investigations, execution of arrest and search warrants, and criminal procedure.

4.   I was previously employed as a Special Agent with the Drug Enforcement Administration (DEA), from March 2008 through January 2011. I am a graduate of the DEA Academy at Quantico, VA, which involved 19 weeks of training in controlled substance distribution and trafficking investigations. I received training on topics such as drug identification, money laundering techniques, patterns of drug distribution and trafficking, the exploitation of telecommunication devices, federal law pertaining to violations of controlled substances, and drug distribution and trafficking conspiracy investigations.

5.   Additionally, I previously served as a Federal Air Marshal for the U.S. Department of Homeland Security (DHS), Federal Air Marshal Service (FAMS), for six months.  I also served for over two years as an intelligence analyst for Baltimore/Washington High Intensity Drug Trafficking Area (HIDTA), assigned to DEA's Washington Division Office.

6.   I have conducted numerous investigations involving the possession, distribution, and trafficking of controlled substances, in addition to the concealment of illicit proceeds from the sale of the controlled substances, violation of federal firearms and explosives laws, and use of firearms in furtherance of drug trafficking. In conducting these investigations, I have utilized a variety of investigative techniques and resources, including

but not limited to surveillance, confidential informants, controlled purchases, electronic surveillance, exploitation of telephone and social media data, the interception of wire communications under Title III, interviews, and the review of financial documents.

7.  The facts contained in this Affidavit are based upon my personal knowledge of the investigation, in addition to my general knowledge, training, and experience, and the observations, knowledge, training, and experience of other officers and agents. All observations referenced below that were not personally made by me, were relayed to me by those who made such observations, either verbally or via reports written by those agents and/or officers.

8.  This Affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me or law enforcement or known to the government, or serve as verbatim or transcribed accounts of interviews or videos referenced in the affidavit.

9.  The term Confidential Informant (CI), which may be referred to in this Affidavit, includes all subjects who  have provided information to law enforcement during the course of this investigation, to include, but not limited to subjects who are working with law enforcement agencies in an official capacity as a CI, victims and/or witnesses to crimes, defendants in criminal proceedings providing information to law enforcement, general citizens who wish to protect their identify while providing information to law enforcement, and/or subjects providing information for consideration on criminal charges yet to be filed. This Affidavit will set forth the parameters under which each identified CI has or is providing information to law enforcement. Law enforcement surveillance referenced in this Affidavit may include the use of electronic surveillance.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

10. The property to be searched, as noted in Attachment A, is an Apple iPhone which was seized from Joe L. FLETCHER III and was processed as ATF Evidence Item # 136 and is currently stored at the ATF Cleveland I Field Office, 5005 Rockside Road, Suite 700, Independence, Ohio, hereinafter the **SUBJECT TELEPHONE.** The applied-for warrant would authorize the forensic examination of the **SUBJECT TELEPHONE** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

11. During September 2019, Federal Bureau of Investigation (FBI) Special Agent (SA) Tim Edquist interviewed an FBI confidential source of information (CI-1). CI-1 originally provided information in exchange for prosecutorial consideration. In addition, CI-1 has been reimbursed for expenses incurred in conjunction with his/her cooperation with law enforcement. Information previously provided by CI-1 has been corroborated on numerous occasions through other investigative techniques. CI-1 stated FLETCHER was selling carfentanil, in addition to large quantities of controlled substance pills, including Percocet pills. CI-1 stated FLETCHER was selling gram quantities of carfentanil for $1000 / gram. CI-1 stated FLETCHER is known to utilize unidentified female subjects to help him traffic the controlled substances, in addition to having those female subjects rent vehicles and apartments for FLETCHER.

12. During this investigation, I have reviewed a number of Facebook posts to a Facebook Profile bearing the name "Joe Fletch (King Fletch)." On June 26, 2020, the "Joe Fletch (King Fletch)," Facebook Profile (Facebook User ID: 100022306506076), hereinafter Facebook Profile 1, contained a profile photograph of FLETCHER with a

female subject, believed to be FLETCHER'S mother. Facebook Profile 1 listed a birthday of "July 30." A review of Ohio Bureau of Motor Vehicle (BMV) record shows FLETCHER'S date of birth as July 30, 1987. On September 1, 2020, the Facebook profile picture for Facebook Profile 1 consisted of a graphic that appears to be an advertisement for a song or music video. A photograph of FLETCHER is displayed within the advertisement graphic, along with the words "MURDER IS LIVE!" across the top of the graphic, "NEW RELEASE" down the left side of the graphic, and "UnitedMasters" down the right side of the graphic.

13. I have reviewed a number of Facebook posts to a Facebook Profile bearing the name "Joe Fletch." On June 26, 2020, the "Joe Fletch" Facebook Profile (Facebook User ID: 100038161125555), hereinafter Facebook Profile 2, contained a profile photograph of what appears to be an online news article screenshot with the headline, "Federal judge orders one of Akron's most dangerous individuals to leave Northeast Ohio," with a photograph of FLETCHER and lists a date of birth of July 30, 1989.

14. I viewed a video featuring FLETCHER on the Facebook Profile 2, which showed a post date of December 18, 2019. The video, entitled "PT 2 Official Real Recognize Real PaperWork Edition," was not recorded within Facebook, but rather was posted to YouTube.com, with a posted date of December 14, 2019, by YouTube.com profile "King Fletch 100." The video started with FLETCHER rapping.  In particular, one of FLETCHER'S lyrics stated, "I left them bodies in the streets."  The video then transitioned to an interview of FLETCHER. During the interview, FLETCHER talked about how basketball star LeBron James "put Akron on the map," but that James told the "other side" of the Akron, Ohio, story and that James was never involved with "what was really going on" in the "streets."

15. In the video, FLETCHER stated, "I'm on the news for leaving them bodies in them streets, period, like, when you see me pop up on that screen, it's about them bodies, feel me, it's about murder after murder, you feel me?" FLETCHER talked about having been shot and having personally removed the bullet from his body. The interviewer asked FLETCHER about when he realized he wanted to be a rapper. FLETCHER said he didn't consider himself a rapper. FLETCHER stated that if you hear him say something he is really telling his life story. FLETCHER stated that he thought other rappers were "faking," and that after he was released from "the feds" he decided he was going to tell his life story. FLETCHER stated he was the most dangerous "n---a in this bitch." FLETCHER stated, "Everyone shooting around this bitch." FLETCHER went on to say, that he was, "At the top of the game, when it come to that s--t . . . I'm really on it, period, I'm at the top of that s--t . . . when it come to playing with that iron . . . I'm number one . . . I'm number one in the city when it comes to playing with that iron . . ." FLETCHER stated that he was "number one when it come to that gun and s--t." FLETCHER stated, "My name been coming up in bodies since I was 15 . . . I'll outlast all these n---as."

16. The interview with FLETCHER then moved to a cemetery, where FLETCHER spoke about an associate of his that was killed when that person was 17 years old. FLETCHER stated that the "thuggin" started with that deceased associate. FLETCHER stated that he was first accused of committing a murder with that associate and first committed a robbery with that deceased associate. FLETCHER went on to give the nicknames for other associates. FLETCHER stated, "When you catch shootings" with other people, "It's a whole different kind of love, like, when you know like, this n---a ready to die, ready to kill about you and s--t . . ."

17. FLETCHER continued to speak about the "love" between his associates. FLETCHER described how having another person's blood on your hands for your associate brings associates closer. As FLETCHER walked in the cemetery he spoke about how those operating the cemetery should thank him. FLETCHER stated, "I've been a big part of these graveyards being built."

18. I reviewed a posting to Facebook Profile 1 which showed a posted date of January 4, 2020. The post appears to have originated as a Facebook live video.  A Facebook live video is a live streamed video that user can post to their page.  In order to stream the video live, the video must be recorded on a device with cellular service or other internet connection.  After the live stream stops, the video remains on the user's page. The text with the post of the "live" video read, "We at the room bottles in bottles. Get here (followed by three pointer finger emojis.)" In the video, FLETCHER spoke about drinking and "pills" at a party FLETCHER and his associates were planning. FLETCHER said, "We've got pills for you."  The video appeared to have been recorded using a cellular telephone.

19. I reviewed a post to Facebook Profile 1, which showed a posted date of January 5, 2020. The post appears to have originated as a Facebook live video. The text with the post of the "live" video read, "I just left Nic D. Harvey he got me f---ed up." In the video, FLETCHER talked about stealing "weed" (marijuana) from "Nic D Harvey."  The video appeared to have been recorded using a cellular telephone.

20. I reviewed a post to Facebook Profile 1, which showed a posted date of January 6, 2020, which read, "You n---as have the same capabilities as me! Wtf is you calling me for . . . get a gun and shoot him in the head," which was followed by several emojis, including a person with hands up, two blast emojis, and a toy or water gun emoji.

21. I viewed a post on Facebook Profile 1, with a posted date of January 8, 2020, of the above described video of FLETCHER, entitled "PT 2 Official Real Recognize Real PaperWork Edition." As noted above this video was not recorded within Facebook, but rather was posted to YouTube.com, with a posted date of December 14, 2019, by YouTube.com profile "King Fletch 100."

22. I viewed a video featuring FLETCHER, which was posted to the Facebook Profile 2, which showed a posted date of January 17, 2020. The post containing the link to the video contained the text, "Realest n---a living you n---as no don't say my name." The video entitled, "WHAT !! NOT CHAMPY" was not recorded within Facebook, but rather was posted to YouTube.com, with a posted date of January 13, 2020, by YouTube.com profile "King Fletch 100." The beginning of the video focuses on a portion of a video from what appeared to be a WSBTV Channel 2 Atlanta news story, which referenced FLETCHER. The video then transitioned to FLETCHER beginning to rap, while FLETCHER was holding what appeared to be a black semi-automatic pistol with a drum style pistol magazine attached. The video then transitioned back to what appeared to be the WSBTV news story, with a recorded conversation between the reporter and a person that was identified in the new story as the mother of a murder victim.

23. In the news story, the subject identified as the mother of a murder victim stated that she wanted FLETCHER brought to court in reference to her son's death. The video then returned to FLETCHER, rapping and holding what appeared to be the same black semi-automatic pistol with an extended pistol magazine. In another scene in the video, FLETCHER appeared holding what appeared to be an AK-style rifle, with a drum style magazine attached. FLETCHER rapped through-out the video, while possessing the suspected firearms. The video ends with another male's voice stating, "During the video

8

FLETCHER says had it not been for this guilty plea by Anthony Smart in 2011 he would be serving a life sentence appearing to admit he took part in the crime." As that text is read and appeared at the bottom of the screen of the video, a Summit County Court of Common Pleas Journal Entry for Case CR 11 02 0449, bearing the defendant name Anthony Smart, can be observed on the screen.

24. I reviewed online Summit County Court of Common Pleas records for Case CR 11 02 0449, which noted that Anthony Smart pled guilty to multiple offenses, including three counts of Attempted Murder, Voluntary Manslaughter with a Firearms Specification, Weapons Under Disability, and Receiving Stolen Property.

25. After viewing the above described video entitled "WHAT !! NOT CHAMPY," I took digital screenshots of the suspected firearms observed in the video, in addition to taking a short video of a portion of the video in which FLETCHER was observed holding the suspected firearms.

26. ATF Special Agent John Laurito, a firearms and interstate nexus expert, reviewed the photographs and a portion of the video. Based upon SA Laurito's training and experience, SA Laurito concluded that the black semi-automatic pistol observed in FLETCHER'S possession appeared to be a Glock semi-automatic pistol, a firearm defined under Federal law, with an extended barrel.

27. I have reviewed online records for Summit County Court of Common Pleas case CR-2005-10-3883(A) which indicate on or about February 23, 2006, FLETCHER was sentenced to prison for more than one year, following conviction by jury trial for offenses that included Trafficking in Cocaine (F-3), Possession of Cocaine (F-3), and Criminal Gang Activity (F-2).

9

28. I have reviewed online electronic docket records identified as originally obtained from the U.S. District Court, Northern District of Ohio, Case 5:14CR334, which indicate on or about March 20, 2015, FLETCHER was sentenced to 39 months prison followed by 36 months supervised release, after having pled guilty to violation of 18 USC 922(g)(1), Felon in Possession of a Firearm. In addition, records indicate on or about December 5, 2017, FLETCHER was sentenced to seven months prison followed by 36 months supervised release, after having been found in violation of supervised release.

29. I have reviewed online electronic docket records identified as originally obtained from the U.S. District Court, Northern District of Ohio, Case 5:19 CR 772, which indicate on or about February 19, 2020, FLETCHER was sentenced to time served, with no supervised release to follow, after having been found guilty of violation of supervised release.

30. I viewed a video which was posted to the Facebook Profile 1, which showed a posted date of January 22, 2020, with a subject line entitled, "Me practicing how ima rob the plug," followed by an emoji with an electrical outlet plug.  Based upon my training and experience, the term "plug" often refers to a drug supplier. At the onset of the video, I observed FLETCHER arranging a large stack of what appears to be U.S. currency. FLETCHER then appeared to hand the cash to another subject that was mostly out of the camera view. After appearing to hand the cash to the subject out of view, FLETCHER then pulled what appeared to be a two tone (silver slide and black frame) semi-automatic pistol from his pocket. FLETCHER pointed the suspected pistol towards the subject out of view. The subject that was out of view of the camera then handed FLETCHER the suspected U.S. Currency, in addition to a necklace, as if FLETCHER had just conducted a dry run of

10

robbing someone at gunpoint. The video appeared to have been recorded using a cellular telephone.

31. During February 2020, the Drug Enforcement Administration (DEA) received information regarding FLETCHER from a cooperating defendant (CI-2). CI-2 was providing information in exchange for prosecutorial consideration. Other information provided by CI-2 has been corroborated by law enforcement investigation. CI-2 identified FLETCHER as selling fentanyl. CI-2 stated FLETCHER has grams of fentanyl for sale for $1,500, which drug dealers could then "cut" with other substances, to then turn the higher potency gram of fentanyl into one kilogram of fentanyl. CI-2 stated FLETCHER was selling the "cut" grams of fentanyl for $50.00 / gram.

32. I viewed a posting to Facebook Profile 1, which showed a posted date of March 6, 2020. The posting contained a link to a video entitled, "WHAT !! NOT CHAMPY" on YouTube.com. This is the same video which was described as having been posted to Facebook Profile 2, on January 17, 2020, in which FLETCHER possessed what appeared to be a Glock semi-automatic pistol, a firearm defined under Federal law, with an extended barrel (see ¶¶ 22-23).

33. I viewed a video posted to Facebook Profile 1, which appeared to have originally been posted to Facebook as a live video which began on or about April 8, 2020. The post listed FLETCHER as being in Los Angeles, California. In the video, FLETCHER appeared to be riding in a vehicle, and at one point FLETCHER directed the recording device to show what was sitting on the seat next to FLETCHER. I observed what appeared to be a black semi-automatic pistol and a stack of U.S. currency, sitting on the seat next to FLETCHER. The video appeared to have been recorded using a cellular telephone.

34. I viewed a video posted to Facebook Profile 1, which appeared to have originally been posted to Facebook as a live video which began on April 9, 2020 at 12:18 AM EST (April 8, 2020, 9:18 PM MST). With the video is the text "AZ." During the video it is apparent that FLETCHER was in Arizona, with an associate, who also appears in the video. The associate's Facebook profile was also tagged in the post.

35. During the video, it appeared that FLETCHER was riding in a vehicle driven by his associate. The video showed a large sum of suspected U.S. Currency on FLETCHER'S lap, in addition to what appeared to be a black semi-automatic pistol.

36. During the video, FLETCHER and his associate exit the vehicle at what appeared to be a local store. While outside of the store, FLETCHER talked about the body odor of another subject that had just passed by FLETCHER and his associate. FLETCHER'S associate made a comment to FLETCHER, which I understood to be FLETCHER'S associate telling FLETCHER to not make an issue out of the body odor of the other subject. FLETCHER then replied to his associate that he (FLETCHER) had "the gun" on him.

37. FLETCHER and his associate returned to their vehicle, at which point FLETCHER brandished what appeared to be the same pistol which was previously observed in the video on FLETCHER'S lap. FLETCHER stated that he had things under control. FLETCHER then went on to talk about how he does not like to fly on airplanes, because FLETCHER liked to have a "gun" wherever he went. FLETCHER stated, "I will stick one of these n---as though." In addition, FLETCHER stated, "Think I'm going to smoke one of these n---as before I leave . . . nah, just playing . . . I will stick one of these n---as though." FLETCHER told his associate that they would talk after the live video was over. FLETCHER said that he's just a rapper and was just talking. FLETCHER again brandished

12

the suspected firearm and pointed the suspected firearm at the recording device. The video appeared to have been recorded using a cellular telephone.

38. After viewing the above described video, I preserved a record of a portion of the video by making an independent recording of the video where the suspected firearm appears in the video on FLETCHER'S lap. SA John Laurito reviewed the recorded video. SA Laurito concluded that the suspected firearm appeared to be a Glock pistol, a firearm defined under Federal law, with an aftermarket pistol grip installed. As noted above, FLETCHER is a convicted felon.

39. I viewed a video featuring FLETCHER which was posted to Facebook Profile 1, which showed a posted date of April 9, 2020. Facebook identified the post as having been made from Puerto Penasco, Sonora, Mexico. The video showed FLETCHER standing next to a car, which was parked next to what appeared to be a single story residence on a dirt road, with other single story residences and vehicles nearby. The video appeared to have been recorded using a cellular telephone.

40. During April, 2020, CI-3 provided information to Investigator Johnson of the Summit County Drug Unit (SCDU) regarding FLETCHER'S plans to travel to an unknown area in Florida to purchase a quantity of fentanyl. CI-3 has provided information to the Akron - Summit County High Intensity Drug Trafficking Area (HIDTA) Initiative since approximately January 2019. CI-3 has criminal convictions and is currently providing information to law enforcement in exchange for monetary consideration. Information provided by CI-3 has been corroborated, to the extent feasible. In addition, CI-3 has successfully participated in other investigations, including conducting controlled purchases of controlled substances.

13

41. On April 23, 2020, I viewed a portion of a Facebook-Live video of FLETCHER on the Facebook Profile 1. In the video, FLETCHER was in possession of what appeared to be large sum of U.S. Currency. FLETCHER spoke about "hating" the Akron, Ohio, area, and was asking those watching the video about who wanted to travel to Miami with FLETCHER.  The video appeared to have been recorded using a cellular telephone.

42. I viewed a video posted to the Facebook Profile 1, which appeared to have originally been posted to Facebook as a live video on or about May 15, 2020. The post showed a location of Atlanta, Georgia. During the video, FLETCHER possessed what appeared to be a black AR style pistol. The suspected firearm was characterized by what appeared to be an AR pistol arm brace and drum style magazine. FLETCHER obtained the suspected firearm from another unidentified subject that appeared in the video. During the video, FLETCHER also possessed what appeared to be a large sum of U.S. Currency.  The video appeared to have been recorded using a cellular telephone.

43. I received information from the DEA, that on or about May 20, 2020, the Florida State Highway Patrol conducted a stop of a vehicle in which FLETCHER was a passenger, driven by a female subject. A search of the vehicle did not produce any fentanyl. FLETCHER was in possession of a large sum of U.S. Currency, estimated to total $2,000 - $3,000.

44. I viewed a video posted to Facebook Profile 2, which appeared to have originally been posted to Facebook as a live video which began on June 13, 2020, at 4:27 PM. Across the video is the text, "You gotta hit these hoes wit he gun out," and "Kingfletch_." The video appears to show FLETCHER having sex with a female. As the sexual intercourse is occurring, the video pans over to what appears to be a black and silver semi-automatic pistol, lying on the bed. A portion of the firearm is underneath a bag.  The video appeared

14

to have been recorded using a cellular telephone.  SA John Sabol, a firearms and interstate

nexus expert, also viewed the video. Based upon SA Sabol's training and experience, SA

Sabol concluded that the pistol appeared to be a Springfield XD semi-automatic pistol, a

firearm as defined under Federal law.

45. I viewed a video posted to the Facebook Profile 1, which appeared to have

originally been posted to Facebook as a live video which began on June 20, 2020, at 6:41

PM. In the video, it appears that FLETCHER is riding in the front passenger seat of a

vehicle. FLETCHER is wearing two chains with large medallions on the chains.

FLETCHER spoke about how he "took" one of the chains from a subject he identified as

"Scoot the kid." FLETCHER told others watching the video to go to ask "Scoot the kid"

how much money he had in order to get his chain back from FLETCHER. FLETCHER

told viewers to tell "Scoot the kid" to bring FLETCHER "20" (believed to be $20,000).

FLETCHER appeared in the video holding what appeared to be a black and silver semi-

automatic pistol. SA Sabol reviewed the video and concluded the pistol appeared to be a

Springfield XD semi-automatic pistol.

46. As the video continued, FLETCHER spoke about how the "real Scoot" told

FLETCHER to "take that s--t off that n---a." FLETCHER said that if "Scoot" (the real

Scoot) said to take the items from "Scoot the kid," that's what was going to occur.

FLETCHER said, "So, I go ahead and strip him . . . go ahead and take this s--t off . . . take

all this s--t off." FLETCHER said he thought about taking the "Porsche truck" that the

subject was driving. FLETCHER went on to talk about how he had just been talking to the

"real Scoot," when the other "Scoot" arrived and FLETCHER proceeded to take his

possessions. FLETCHER said he thought about making "Scoot" get naked, but he decided

against doing so. FLETCHER spoke about how "Scoot" had his "little gun, his little pee

15

shooter." FLETCHER then brandished what appeared to be two different silver and black semi-automatic pistols, at the same time, while speaking about how "Scoot" had a small firearm compared to FLETCHER's "big a-- nickel." SA Sabol reviewed the video and concluded the two pistols appeared to be a Springfield XD semi-automatic pistol and a Kahr Arms semi-automatic pistol.

47. FLETCHER said "Scoot the kid" gave him this "little b---h a-- gun." FLETCHER appeared to check whether the suspected firearm he took from "Scoot" had a round in the chamber of the firearm. FLETCHER then said, "Well at least he had one in the head," meaning FLETCHER saw that there was a round of ammunition in the chamber of the firearm. FLETCHER proceeded to say, "I'm robbing everything until my unemployment come." During the video, FLETCHER said "I was going to smoke him, because that's all I know for real." FLETCHER spoke about how he was not really a robber, and was more accustomed to "smoking n---as." FLETCHER again brandished the previously described black and silver semi-automatic suspected pistols at the same time. FLETCHER stated that the subject he robbed the chain from (Scoot the kid) almost broke the chain off of his neck in order to provide it to FLETCHER. FLETCHER said, "I was going to blow his head off." Later in the video, FLETCHER told the driver of the vehicle he was riding in to drive to "Bellevue," believed to be Bellevue Avenue, Akron, Ohio, as he needed to get some "weed" (marijuana). FLETCHER again said, "I'm on bulls--t until my unemployment come," while brandishing what appeared to be one of the previously described suspected pistols.  The video appeared to have been recorded using a cellular telephone.

48. I viewed a posting to Facebook Profile 2, with a listed posting date of June 21, 2020, at 4:00 AM. The post appeared to be a repost of the video FLETCHER appeared in on Facebook Profile 1, posted on June 20, 2020, described above, in which FLETCHER

brandished two suspected firearms while he discussed robbing another subject (see ¶¶ 45-47). The post to Facebook Profile 2 contained the message, "A real n---a said f--k you so what happened was post to happen only if n---as 100 the Murda rate a be wayyyyyy higher," followed by three person emojis.

49. On June 24, 2020, law enforcement officers from the Ohio-Northeast Smuggling Enforcement Team (ONSET) were conducting surveillance and determined that FLETCHER was traveling in a tan Chevrolet Malibu, bearing Ohio registration HTF2500, in Copley, Ohio. Law enforcement surveillance notified Ohio State Highway Patrol (OSHP) Trooper Matthew Dowler about their observations, and that the vehicle was currently located on State Route 18, near Interstate 77, in Copley Ohio. Trooper Dowler, who was driving a marked OSHP patrol vehicle, attempted to initiate a traffic stop of the tan Chevrolet Malibu, for a window tint violation. The driver of the vehicle failed to comply and a vehicle pursuit ensued. Trooper Dowler and other OSHP Troopers pursued the vehicle. During the pursuit an OSHP airplane began to follow the fleeing vehicle from above. The vehicle came to a stop near Thurston Street and Yukon Avenue, Akron, Ohio. OSHP observed five subjects flee from the vehicle. In particular, OSHP Trooper Adam Anderson observed FLETCHER flee from the left rear passenger seat of the vehicle. Trooper Anderson cleared the vehicle and observed a Norinco MAK 90 Sporter .762 rifle, bearing serial number CW-21047, propped up against the center console, in the rear area of the vehicle. Trooper Anderson secured the firearm, prior to pursuing the subjects that fled from the vehicle.

50. Personnel from a number of law enforcement agencies responded to establish a perimeter, in an attempt to apprehend the subjects that fled from the vehicle. As the search was underway, on June 24, 2020, FLETCHER posted a Facebook live video, which was

later able to be viewed on both Facebook Profile 1 and Facebook Profile 2. I viewed a portion of the video while the video was live and have subsequently watched the entirety of the video. In the video it is apparent that FLETCHER is in an area with high grass and shrubs and that FLETCHER had just fled from law enforcement. FLETCHER stated, "If the police come, f--k them bitches, I'm shootin at them." FLETCHER sat down during the video in the high grass and later stated, "I don't really give a f--k no more, everything already, had been got rid of." FLETCHER later stated that he was too tired to keep running, and added, "When I come out these woods, if them bitches at the end of the woods, I'm shooting at these bitches. If they at the end of the woods, I'm shooting at these hoes." FLETCHER spoke about how deep in the woods he was, how long it would take to get out of the woods, and not knowing where he was located. FLETCHER stated, "I've been out the feds too long now, I can't let them take me back like this." In addition, FLETCHER stated, "I don't give a f--k, f--k these people. If them people come bother me, they gonna have to kill me. When I come out this room, when I come out these woods, if these people waitin, these people gonna have to kill me, I would give a f--k." FLETCHER spoke about how he told others, presumably the others in the vehicle that fled from the OSHP, they had to get back to the "hood" before pulling over. Near the end of the video, you can hear OSHP troopers announcing their presence and the presence of a K-9 apprehension dog. FLETCHER verbally responded. In the video, OSHP troopers can be heard providing verbal commands to FLETCHER, prior to taking FLETCHER into custody.  The video appeared to have been recorded using a cellular telephone.

51. In addition to FLETCHER being apprehended, two other subjects were apprehended - Savanna Brice, and a male juvenile. Brice was found in possession of suspected controlled substances, including suspected crack cocaine and suspected cocaine.

After FLETCHER'S apprehension, FLETCHER requested medical assistance, including stating that he had swallowed drugs. FLETCHER was transported to the Cleveland Clinic Akron General. FLETCHER was evaluated and medically cleared. FLETCHER was then transported to the Summit County Jail by OSHP.

52. The seized Norinco MAK 90 7.62 rifle was submitted to the Ohio Bureau of Criminal Investigation (BCI) laboratory for Deoxyribonucleic Acid (DNA) analysis, in an attempt to obtain a DNA profile from the firearm, suitable for comparison. Ohio BCI reported that they were unable to obtain DNA profiles suitable for comparison, from the rifle. The seized rifle appears similar in style and build to an AK-47 rifle. The seized Norinco MAK 90 7.62 rifle is consistent in appearance with the suspected rifle which FLETCHER possessed in the rap music video described above in paragraph 23.

53. On June 24, 2020, ONSET Agent Jared Haslar and I conducted an interview of FLETCHER, while FLETCHER was detained at the Summit County Jail. The interview was audio recorded and I have preserved the recording as evidence. I advised FLETCHER of his Miranda Rights by reading from a printed Miranda Warning card. FLETCHER indicated he understood his rights and was willing to speak with myself and Agent Haslar. FLETCHER denied having any knowledge of the firearm that was seized earlier that day. FLETCHER claimed to have been in the woods, where law enforcement took him into custody, taking in the scenery, getting his "peace of mind," and discussed shooting a rap music video. FLETCHER provided consent to collect DNA samples by swabbing the inside of FLETCHER'S mouth. I processed the oral swabs used to swab the inside of FLETCHER'S mouth as ATF evidence.

54. During the interview, I asked FLETCHER about "Scoot" (see ¶¶ 45-47). FLETCHER stated he did not know who "Scoot" was. I again asked FLETCHER if he

19

knew anyone that goes by the name "Scoot." FLETCHER stated that he uses "Scoot" as slang. I asked what the term "Scoot" meant if FLETCHER used it as slang. FLETCHER responded, "Get away from me." FLETCHER then said he knew someone by the name of "Scooter." Later in the interview, I asked FLETCHER if he knew anyone that was involved in robberies. FLETCHER stated that he and his associates fake robberies in movies, to publicize his music. FLETCHER stated that the world loves controversy, so that he may play out a robbery or a shooting. FLETCHER stated he currently had a fake robbery scheme with a subject from Indiana. FLETCHER would not provide the name of that subject.

55. During the interview, FLETCHER stated that he had previously been involved in homicides. FLETCHER stated he shouldn't have made it to the age of 30. Agent Haslar asked FLETCHER, why he thought that.  FLETCHER responded, "All the s--t, I did, all the murders, all the times I been killed, all the people that have been killed around me . . . " Agent Haslar asked FLETCHER about his statement about having murdered people. FLETCHER responded, "It's not no mystery, everybody know, I've been in all type of s--t." FLETCHER went on to say that there were unsolved murders and that law enforcement had not done their job.

56. On June 25, 2020, FLETCHER was arraigned in Akron Municipal Court, on charges of having a weapon under disability, improper handling firearms in a motor vehicle, resisting arrest, and obstruction of official business. FLETCHER posted bond the same day, and was released from law enforcement custody

57. On June 25, 2020, law enforcement officers from the ATF, OSHP, and ONSET conducted a canvass of the wooded area where FLETCHER had been apprehended. The canvass resulted in the recovery of suspected crack cocaine, packaged in multiple plastic

20

bags. I conducted a field test of a small portion of the seized suspected controlled substances, which showed positive for the presence of cocaine. In addition, I utilized three different sterile swab sets to swab the outside of portions of the packaging material, in an attempt to obtain DNA profiles suitable for comparison. The DNA swab sets were processed as evidence by the OSHP, and were submitted to the BCI laboratory for analysis. Ohio BCI reported that they were unable to obtain DNA profiles suitable for comparison from the swabs of the drug packaging. The suspected crack cocaine was processed as evidence by the OSHP and was submitted to the OSHP laboratory for further analysis. OSHP laboratory determined the suspected crack cocaine to be a total of 39.3893 grams of crack cocaine. In addition, law enforcement located and seized a cellular telephone from the area where FLETCHER had been arrested, identified as belonging to FLETCHER. Agent Haslar obtained a search warrant through the Summit County Court of Common Pleas to search the contents of that cellular telephone.

58. I viewed a video which originated as a Facebook live video by FLETCHER on June 25, 2020 at approximately 11:50 PM, which was later visible on both Facebook Profile 1 and Facebook Profile 2. FLETCHER stated, "I don't know how they think they're gonna get a conviction on this one, everybody, everybody know that wasn't my K." FLETCHER later stated, "I didn't have nothing but a punk ass K . . . they charged me with a punk ass K." Based on my training and experience, when FLETCHER says "K," I believe he is referring to an AK-47 style rifle. In the video, FLETCHER claimed that the location where he was apprehended by the OSHP was just a place where he hangs out. FLETCHER showed a portion of Akron Municipal Court paperwork with his listed charges. FLETCHER denied possessing an AK-47 or being involved in a pursuit with law enforcement. FLETCHER stated, "They so dumb though, like if you only knew, if a

motherf--ka only knew, but I ain't trippin, okay they got me charged with a K, cool, I'll take that, I'll take that, okay, K, boom, that ain't nothing, that was a felony 4, that whole little scenario was worse. That's all ya'll got is a K, out this situation, s--t bitch, I still live to fight another day." Later in the video, FLETCHER said that he was about to post his "cash app" information and asked that everyone send him $5.00, "So that we can pay to get this case 'tooken,' 'tooken' away man, god damn man, we need to pay my little dude man, he [inaudible], come to find out he he the one that left the gun in the car." During the video, FLETCHER regularly commented on written comments posted to the video by people watching at the time.  The video appeared to have been recorded using a cellular telephone.

59. I have previously documented, including in an affidavit to this court, that during the video, I heard FLETCHER call out to a person I documented as "STACK." I previously documented that FLETCHER stated, "STACK, you is the reason I was running around, with that g . . ." FLETCHER then stopped what he was saying, blew air, and then continued by saying, "God dammit, I called you and told you I need a hand, and your ass was like, okay, okay, give me a second, then I was like f--k it, I gotta go grab the ya, and I went and grabbed ya, and this is what happened man." At the time I documented FLETCHER'S statements from that video, I believed that was the best written translation of FLETCHER'S statements.

60. During a review of evidence in this investigation, I again reviewed the video referenced above in paragraph 59. During the review, I utilized a commercially available video player which allowed me to slow the playback speed of the video and audio. After reviewing the video, I believe FLETCHER said "hammer," while seeming to stop or trail off towards the end of the word, and that FLETCHER did not say "hand." In addition, I believe FLETCHER initially said he had grabbed the "yop," and then said he had grabbed

the "ya." Finally, I believe the nickname of the person FLETCHER called out to during the video was "Stac," not "Stack." This analysis is supported by additional information I have received during this investigation, which I received after having originally documented FLETCHERS statements in the video. I will explain further.

61. On July 13, 2020, U.S. Magistrate Judge Kathleen B. Burke, issued two federal search warrants, one for Facebook Profile 1 and one for Facebook Profile 2. The search warrants provided authorization to search Facebook records for evidence of 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm and 21 U.S.C. § 841 (a)(1), Possession with Intent to Distribute a Controlled Substance, and 18 U.S.C. § 924(c), Use of a Firearm in Furtherance of a Crime of Violence or Drug Trafficking Crime.

62. On July 13, 2020, I served Facebook with the authorized search warrants for Facebook Profile 1 and Facebook Profile 2, requesting all information and records authorized by the search warrants.

63. On July 29, 2020, Facebook provided the requested records for Facebook Profile 1 and Facebook Profile 2. Pursuant to the warrant, Facebook provided records dated through July 13, 2020. During the analysis, I have reviewed messages between Facebook Profile 1 and two Facebook profiles, "Nephew Stac' Sumn Carmichael," bearing Facebook User ID 100001566519585, and Facebook profile "Stac Sumn," bearing Facebook User ID 100029876554185.

64. Records show on December 31, 2019 at 3:13 PM EST, Facebook Profile 1 received a message from "Nephew Stac' Sumn Carmichael" stating, "I got a k for sale big bro." As noted above, I know "k" is a term used to refer to an AK-style rifle. Facebook Profile 1 responded on December 31, 2020 at 3:34 PM EST, "What u want." "Nephew Stac' Sumn Carmichael," then responded, "7." These written messages were followed by "Nephew

23

Stac' Sumn Carmichael" attempting to video chat with Facebook Profile 1, and then Facebook Profile 1 attempting to video chat with "Nephew Stac' Sumn Carmichael." Records show a video chat between "Nephew Stac' Sumn Carmichael" and Facebook Profile 1 occurred and ended on December 31, 2019 at 4:14 PM EST. Approximately 11 seconds later, "Nephew Stac' Sumn Carmichael" sent what appears to be a telephone number, "310-467-1481," to Facebook Profile 1. Based on these messages, it appears that the continued communication regarding "Nephew Stac' Sumn Carmichael" occurred via telephone. As noted above in paragraphs 23 and 52, FLETCHER was in possession of a suspected rifle during a rap music video on January 13, 2020, which is consistent in appearance with the Norinco MAK 90 7.62 rifle seized in this investigation, following these messages on December 31, 2019 in which FLETCHER is communicating about purchasing a rifle.

65. I have reviewed Facebook records and messages of communication between Facebook Profile 1 and Facebook Profile "Stac Sumn." In particular, records showed that a Facebook video chat occurred between Facebook Profile 1 and Facebook Profile "Stac Sumn" on June 23, 2020 at 5:28 PM EDT and on June 23, 2020 at 08:18 PM EDT.

66. Following the documented Facebook video chats, a direct written message exchange occurred between Facebook Profile "Stac Sumn," and Facebook Profile 1. The following exchange of messages occurred between June 23, 2020 at 11:02 PM EDT and 11:27 PM EDT:

    a.  Fletcher Facebook Profile 1: "N---a I'll cashapp to you."

    b.  Stac Sumn: "I only got 9s Taurus 260 the other shit gone to NY."

    c.  Stac Sumn: "Unless u wanna go to gun store tomorrow."

    d.  Fletcher Facebook Profile 1: "That's kool what u want for it." Followed by a message, with text, "I just want everything."

    e.  Stac Sumn: "U can pick what u want this hoe gone put em in her name."

    f.  Fletcher Facebook Profile 1: "Ok kool how long they take."

    g.  Stac Sumn: "U get em the same day she just gotta do the paper work that's it"

    h.  Fletcher Facebook Profile 1: "Ok let me know when"

    i.  Stac Sumn: "Tomorrow," followed by "Like 3:00," followed by "Imma call u when we get to the store"

67. Based upon my training and experience, I believe that in the above messages, FLETCHER and "Stac Sumn" were messaging about "Stac Sumn" arranging for a firearm to be purchased for FLETCHER. When "Stac Sumn" described "paper work" needing to be completed, I believe "Stac Sumn" is referring to an ATF Firearms Transaction Record, ATF Form 4473, which must be completed in order to purchase a firearm from a Federal Firearms Licensee (FFL). The information provided by a purchaser of a firearm on an ATF Form 4473 is what is provided to the National Instant Criminal Background System (NICS), in order to determine if someone is or is not prohibited from being able to purchase and possess a firearm. The messages between FLETCHER and "Stac Sumn" indicate to me that "Stac Sumn" was going to have a female subject complete the ATF Form 4473 and purchase a firearm for FLETCHER. As noted, FLETCHER is prohibited from being able to possess firearms.

68. On June 26, 2020, at 1:08 AM EDT, after FLETCHER posted bond through Akron Municipal Court and was released from jail, Facebook Profile 1 sent a message to Facebook Profile "Stac Sumn," "I'm back what up doe I need one now ASAP." Approximately two minutes later, "Stac Sumn" replied, advising FLETCHER to call him

in the morning. FLETCHER responded, "Ok." In these messages, I believe FLETHCHER
was again asking "Stac" for a firearm.

69. The content of these messages between Facebook Profile 1 and "Stac Sumn" and
"Nephew Stac' Sumn Carmichael," furthers my belief that FLETCHER said "hammer" and
"yop," when speaking about "Stac" in the video. The messages show that FLETCHER was
asking "Stac" for a firearm on June 23, 2020, and "hammer" is a slang term for a firearm.
In the video, FLETCHER indicated that "Stac" did not provide assistance to FLETCHER
in as timely a manner as FLETCHER desired, so FLETCHER went to get the "yop." As
previously noted, FLETCHER was arrested after fleeing from a vehicle from which a
Norinco MAK 90 Sporter 7.62 rifle was seized. This type of rifle is often referred to as an
"AK," despite the rifle not truly being an "AK-47." A common slang term for an AK-style
rifle is "chopper." Online open source information indicates "yopper" is also a slang term,
used in place of the more commonly known "chopper." Based on the totality of the
information available, I believe FLETCHER was using the term "yop" to refer to the rifle
seized from tan Chevrolet Malibu from which FLETCHER fled on June 24, 2020.

70. I viewed a video posted to Facebook Profile 1, which appeared to have originally
been posted as a Facebook live video on August 8, 2020, at approximately 12:30 AM.
During the video FLETCHER was sitting with a female subject, on a couch inside a
residence. SA McCausland determined the female subject in the video was Savanna Brice,
based on the conversation that occurred during the video and after reviewing an Ohio BMV
photograph for Brice. FLETCHER spoke about his relationship with the female subject,
believed to be Brice. In the background of the video, SA McCausland heard what sounded
like someone knocking at a door. FLETCHER told Brice, "Grab the gun." FLETCHER
walked to a door to the residence, asked who was at the door, while appearing to look out

26

the window of the door. FLETCHER appeared to recognize the subject at the door, inviting that male subject into the residence. While the male subject remained mostly out of view of the camera, FLETCHER focused the video on what appeared to be a dark colored revolver with a black grip. The male subject referred to the suspected revolver as a "44" and that it was brand new, out of the box. FLETCHER then brandished what appeared to be a black semi-automatic pistol with an extended pistol magazine, while asking the male subject, "Whatcha gonna do after them six shots are over n---a, run and duck for cover?" The male subject sounded as if he introduced a female subject to FLETCHER and another female subject present (believed to be Brice). The male subject referred to someone as a "cousin." FLETCHER stated that he should be introduced as "John Doe," in case the male subject came over the next day with a different person. During the video, FLETCHER and Brice spoke about shooting each other. FLETCHER commented on Brice possessing a "gun," out of view of the video, and later told Brice, "Put my gun down."

71. FLETCHER panned the video towards the female subject identified as Brice, while commenting on Brice shining a red laser beam on onto what appeared to be a living room wall. FLETCHER commented that he didn't need a beam, stating "I don't need no beam. What the fuck I need a beam for? I'm gonna shoot all these bitches out, what the fuck I need a beam."

72. FLETCHER and the male subject began to speak. FLETCHER stated that the male subject was the reason FLETCHER had to run from the helicopter, which SA McCausland understood to be a reference to FLETCHER'S pursuit from law enforcement on June 24, 2020, in which an OHSP airplane was used to follow FLETCHER. FLETCHER stated that if the male subject had answered his telephone and obtained five rooms for FLETCHER, he would not have had to switch rooms. The male subject spoke with FLETCHER about

also having a room. SA McCausland understood the conversation about rooms to be referencing hotel rooms at the Fair Bridge Inn & Suites in Copley, Ohio, where FLETCHER had been prior to fleeing from OSHP. The male subject spoke about going to FLETCHER'S room and that FLETCHER was not at the room. In response, FLETCHER stated, that FLETCHER probably had a "007 moment" when he thought he was going to kill somebody, and ran out of the room. FLETCHER stated if the male subject had obtained the hotel rooms, the helicopter would not have seen him come out of his room. Brice spoke about how at one time she believed that the male subject speaking with them was involved with the helicopter tracking FLETCHER and Brice. FLETCHER stated he had been back in the mud and spoke about needing help to get out of that area, while stating he had left his Gatorade in the car. As noted above, OSHP recovered a Norinco MAK 90 Sporter .762 rifle, which was propped up against the center console, in the rear area of the vehicle from which FLETCHER fled.

73. During the video, FLETCHER stated that when the police took him into custody he acted like he fainted, because he did not want to get into the police car. FLETCHER went on to say that he acted like he had a heart attack and claimed to have coronavirus, and needed to go the hospital. Towards the end of the video, the male subject asked FLETCHER if he had something going on. FLETCHER stated he had something going on, but wasn't going to talk to the male subject about that right now. FLETCHER then said he was going to talk to the male subject, and soon after the Facebook live video ended.  The video appeared to have been recorded using a cellular telephone.

74. SA McCausland viewed a video posted to Facebook Profile 1, which appeared to have originally been posted to Facebook on August 10, 2020. During the video, FLETCHER said that he was with other people yesterday and that they were sitting there

"getting' money." FLETCHER said that "they" were rolling up so much "weed" (marijuana) and "woods." FLETCHER said $100 "7s," can really go for $50. FLETCHER spoke about having different prices for "7s." SA McCausland understood FLETCHER to be referring to 7 grams of a controlled substance, when he referred to "7s," which is approximately ¼ of an ounce. FLETCHER spoke about how people are scared of him. FLETCHER said that he cannot talk too much on social media. FLETCHER went on to say that he saw a police officer at the Chipotle restaurant and the police officer told FLETCHER that he watched his videos. FLETCHER speculated that the "feds" were probably watching him. FLETCHER said that given all the "shit" he has done he should either be in prison, or "not breathing." FLETCHER appeared to be smoking a joint during the video.

75. FLETCHER spoke about his "bloodline" being violent. FLETCHER spoke about how others are not as tough as they sometimes portray. FLETCHER spoke about how he would "hit a n---a" and then placed one hand in a position consistent with that of a pistol, and the other hand in a position to hold his other hand, while loudly saying "pow," as if FLETCHER was pretending to shoot a firearm. FLETCHER stated, "You know I ain't playin." FLETCHER stated he still had his "jab," and then appeared to use his left hand to act as if he was pulling the trigger of a firearm multiple times.  The video appeared to have been recorded using a cellular telephone.

76. SA McCausland viewed a video posted to Facebook Profile 1, which appeared to have originally been posted as Facebook live video on August 11, 2020, at approximately 1:03 PM. FLETCHER asked someone, who was out of view of the camera, if the "blunt" was gone. FLETCHER stated he was "high as hell." FLETCHER appeared to begin to watch the list of other Facebook users that were watching his Facebook live video.

FLETCHER said that everybody saw him running from the helicopter and that others were hoping FLETCHER would go to jail. FLETCHER stated that he talked to his attorney and that "they" didn't know what they were doing with the case. FLETCHER stated that "them people" were confused as they were dealing with "a different kind of animal," as FLETCHER did not "give a f---." FLETCHER stated that he was going to take his case to trial. FLETCHER spoke about how he had been to the "feds" and had learned all about law. FLETCHER spoke about the prison time he previously received for possessing a firearm. FLETCHER went on to say, "If a mother---er can protect they-self, why can't I? I don't give a f--- if I've been in trouble before, like, so you trying to say that since I've been in trouble, I can't still protect myself, because I've been in trouble before . . . ya'll got me f---ed up . . . so they know I'm fighting." FLETCHER went on to say that since he had been to federal prison there was nothing someone could tell him about a "gun" or what you can get "enhanced on," that FLETCHER did not already know. FLETECHER stated that "mother---ers" need a gun. FLETCHER stated, "You let that old ass white man sit around with a gun, bitch, I am too." FLETCHER spoke about not needing to go to court because of coronavirus, and claimed to have coronavirus.

77. In the video, FLETCHER said, "If they think I'm going to jail, I'm going to make the biggest fuss, I can possibly make, I wouldn't give a f--- . . ." FLETCHER stated he had so many ways to make money right now, without "f---ing with the drug trade." FLETCHER stated that if anything goes wrong in his life he is going to capitalize off of it and get paid for it. FLETCHER stated, "Don't make me pull no god damn dramatic stunt on you bitches, and get to squeezing this thang, when ya'll pull up, because I am not going, when I feel like I'm right. When I feel like I'm right, as long as I got my excuse, I'm ready

to do anything." FLETCHER stated, "If somebody done killed somebody for a lesser reason, before, then I got all the rights to do the same thing."

78. Later in the video, FLETCHER claimed that he was "just" a rapper and that his time in federal prison, title as "most dangerous," money, and a female subject in the video was all part of an act. FLETCHER briefly showed an object that was consistent in appearance with a black semi-automatic pistol with an extended pistol magazine, and then stated that it was only a "prop" and could not hurt anyone. FLETCHER later said that him being a violent individual was in his genes and that the streets did not have rules, so FLETCHER had to play by no rules.  The video appeared to have been recorded using a cellular telephone.

79. SA McCausland viewed a video posted to Facebook Profile 1, which appeared to have originally been posted as a Facebook live video on August 18, 2020. The video of FLETCHER appeared to have been recorded in a vehicle. Two black male subjects, who appear younger in age than FLETCHER, were also in the vehicle with FLETCHER. One subject was in the front seat next to FLETCHER and the other subject was in the back seat. In the beginning of the video, FLETCHER prepared what appeared to be a marijuana joint. FLETCHER showed and spoke about a package of suspected marijuana, which contained a label titled, "yessir." During the video, FLETCHER asked the subject in the back seat if he was "ready," referred to that subject as "Taliban," and referenced that subject wearing a hood. The subject in the back seat said, "We out here killing." In response, FLETCHER said, "No we ain't, we out here on your ass, bitches . . ." as FLETCHER continued to roll the suspected marijuana joint.

80. During the video, FLETCHER and the other two subjects appeared to watch the list of other Facebook profiles watching the video and comments being made by the users of

other Facebook profiles. FLETCHER noticed that one of the Facebook profiles watching the video did not have a profile photograph. FLETCHER appeared to joke and asked, who had sent that person. FLETCHER then said, "Pull guns out ya'll," and again asked who had sent that person. As this occurred, FLETCHER reached out of view of the video. SA McCausland then observed what appeared to be the end of an extended pistol magazine. FLETCHER can be seen lighting and smoking the suspected marijuana joint that he had previously prepared on the video. FLETCHER spoke about being "high." The male subject in the back seat appeared to speak in response to comments being made by viewers of the video, appearing to get agitated. FLETCHER told the subject in the back seat to pull his gun out the next time "she" said something. The male subject claimed there were no firearms in the vehicle. The male subject in the back seat appeared to smoke the suspected marijuana joint rolled by FLETCHER, while complaining about how the joint had been rolled.

81. The other subject in the front seat commented on comments being made by viewers of the Facebook live video. FLETCHER appeared to chastise the other subjects, "See, see, that's what I'm saying, that's why we gonna catch a murder case, you can't pay that no attention, he was being cool, that's why he said bro." FLETCHER described the two male subjects as cave men with "billy-clubs," but that their "billy-clubs" were guns.  The video appeared to have been recorded using a cellular telephone.

82. On or about September 3, 2020, the U.S. District Court, Northern District of Ohio, issued a federal arrest warrant, pursuant to an indictment, for violation of 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm and Ammunition, 21 U.S.C. § 841 (a)(1), Possession with Intent to Distribute a Controlled Substance, and 18 U.S.C. § 924(c), Possession of a Firearm in Furtherance of a Drug Trafficking Offense.

83. On September 6, 2020, I viewed a video which was posted to FLETCHER'S Instagram profile, "kingfletch_." The video appeared to have been posted the day prior. The video shows a number of APD officers outside of a residence near a roadway, involved in some sort of police activity. A male voice, which I have come to know as FLETCHER'S voice, speaks during the video, including making the statements, "Somebody need to pull through and shoot these honkies . . . these bitches, I should, I should up the Glock on you punk bitches, right now you bitch." The video then panned down to what appeared to be a Glock, Generation 4, pistol with an extended pistol magazine, in the cup holder of a vehicle. As FLETCHER continued to speak, saying "I should pull up," and the video cut off.  The video appeared to have been recorded using a cellular telephone.

84. On September 8, 2020, law enforcement officers from the United States Marshal Service (USMS), ATF, APD, OSHP, and ONSET attempted to locate FLETCHER to take FLETCHER into custody pursuant to the federal arrest warrant. USMS TFO Troy Meech observed FLETCHER driving a tan Cadillac, which is registered to FLETCHER'S mother and which FLETCHER is known to regularly drive. USMS TFO Meech alerted other law enforcement officers in the area about observing FLETCHER driving southbound on Hawkins Avenue near Courtland Avenue, Akron, Ohio. Other officers, who were driving both undercover and marked police vehicles, converged to the area where FLETCHER was last seen driving. FLETCHER then drove northeast on Diagonal Road from Hawkins Avenue, until turning east onto Bisson Avenue, at which point FLETCHER drove his vehicle at a high rate of speed away from law enforcement. Marked APD patrol vehicles pursed FLETCHER. FLETCHER turned north on East Avenue from Bisson Avenue, west on City View Drive, north on Magennis Avenue, west on Bellevue Avene, and southwest

33

on Diagonal Road. Marked patrol vehicles partially blocked the intersection at the joint intersection of Diagonal Road, Bisson Avenue, and Mercer Avenue. FLETCHER came to a stop at that intersection. FLETCHER was taken into custody by APD and OSHP. Upon making contact with FLETCHER and ordering FLETCHER out of the vehicle, OSHP Sgt. Todd Roberts observed FLETCHER in possession of the **SUBJECT TELEPHONE**. While Sgt. Roberts and other OSHP and APD officers placed FLETCHER in custody, Sgt. Roberts placed the **SUBJECT TELEPHONE** on the driver's seat of FLETCHER'S vehicle. Shortly thereafter, OSHP Lt. Neil Laughlin retrieved the **SUBJECT TELEPHONE** and transferred custody of the **SUBJECT TELEPHONE** to me. I processed the **SUBJECT TELEPHONE** as ATF Evidence and secured the **SUBJECT TELEPHONE** at the ATF Cleveland I Field Office, Independence, Ohio. Based upon my training and experience, I know that the **SUBJECT TELEPHONE** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **SUBJECT TELEPHONE** first came into the possession of law enforcement. FLETCHER was not found in possession of firearms or ammunition.

85. On the evening of September 8, 2020, following FLETCHER'S arrest, ATF TFO John Christie listened to telephone calls made my FLETCHER through the recorded telephone service at the Summit County Jail. On September 8, 2020, at 5:11 PM, FLETCHER placed an outgoing telephone call to his mother, at telephone number 330-606-0594. During the call FLETCHER requested that his mother call Brice from his mother's telephone, so that FLETCHER could speak with Brice. FLETCHER told Brice, "Yeah, [unintelligible] go back track you know? The thirty. The thirty up there. But um." Brice replied, "Say that one more time babe." FLETCHER then said, "Yea, I'm sayin you

know what the hell I was goin. You know it's out there." Brice replied, "Yea, I know."
Based on my training and experience, I believe FLETCHER was telling Brice that he had
discarded a firearm with a thirty round magazine, during the pursuit with law enforcement.
As noted above, approximately three days prior, FLETCHER had posted a video to
Instagram in which he was in possession of a Glock, Generation 4 pistol, with an extended
pistol magazine.

86. On September 9, 2020, ATF and APD conducted a search for the firearm believed
to have been discarded by FLETCHER during the pursuit. The search was aided by ATF
SA Dave McMullen, and his Search Enhanced Evidence Canine (SEEK), K-9 partner,
Opelika "Opey." SA McMullen and K-9 "Opey" were walking west on the sidewalk on the
north side of City View Avenue, near Magennis Avenue, when K-9 "Opey" located a
Glock 17, Generation 4, 9mm pistol, bearing serial BCHH263, in the front yard of a
residence. The firearm had a round of 9mm ammunition in the chamber of the firearm, and
a thirty round magazine which appeared to be loaded to capacity. SA McCausland, as
witnessed by SA McMullen and APD Det. James Alexander, recovered the firearm, while
making all effort to preserve the loaded firearm for DNA analysis. Law enforcement
officers conducted a canvass of the neighborhood for surveillance video which may have
captured FLETCHER discarding the firearm in the front yard of the residence. ATF
obtained a video which captured FLETCHER'S pursuit from law enforcement. The video
shows a black object, consistent in shape and size with the recovered Glock 17 9mm pistol
with an extended pistol magazine, landing in the front yard as FLETCHER'S vehicle
passed by the residence where ATF recovered the firearm.

87. Based upon my training and experience, I know that persons who are involved in
the unlawful possession and distribution of controlled substances will use cellular or

wireless telephones to contact their customers and/or suppliers of controlled substances. Similarly so, I know that those who are prohibited by law from being able to possess firearms and ammunition, will use their cellular telephones to coordinate the illegal transfer and/or purchase of firearms. Cellular telephones offer a broad range of capabilities which facilitate these illegal activities. These capabilities include: storing names and phone numbers in electronic "address books;" storing voicemails; storing a "call log" which records the telephone number, date, and time of calls made to and from the telephone; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing notes and electronic messages; storing and playing back audio files; storing dates and appointments; accessing and downloading information from the internet; and allowing the operation of web-based communication and social media applications, such as Facebook, Instagram, Twitter, and Snapchat. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

88. I believe the issuance of a search warrant for the **SUBJECT TELEPHONE** has the ability to provide investigators evidence of violations of federal law, to include the manner in which FLETCHER receives controlled substances, the manner in which he distributes those controlled substances, provide details about how FLETCHER has obtained or disposed of firearms and ammunition, how FLETCHER has used firearms in furtherance of drug trafficking, the locations where these offenses have occurred, and may identify subjects engaged in these offenses with FLETCHER.

## TECHNICAL TERMS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

89. Based on my knowledge, training, and experience, and the knowledge training and experience of those in law enforcement with whom I have consulted, I know that electronic devices, to include cellular or wireless telephones, commercially available today allow the operator to complete tasks similar to tasks able to be conducted on a desktop, tablet, or laptop computer. Electronic devices, such as cellular telephones, are able to access the internet, create, store, and manipulate electronic files, and utilize a myriad of applications which provide access and services consistent with a traditional desktop, tablet, or laptop computer.  I know that cellular telephones have the capability to record and store video, as well as to directly upload or "post" such video to various social media platforms, including Facebook and Instagram.

90. Electronic devices, such as a cellular telephone, can store information for long periods of time. This information can sometimes be recovered with forensics tools. There is probable cause to believe that information that was once stored on the **SUBJECT TELEPHONE** may still be stored there, for at least the following reasons:

      a.  Based on my knowledge, training, and experience, and the knowledge training and experience of those in law enforcement with whom I have consulted, I know that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto an electronic storage device, deleted, or viewed via the internet.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  I have been advised that this is so because when a person "deletes" a file on a computer or electronic device, the data contained in the

37

file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the electronic device that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, an operating system for an electronic device may also keep a record of deleted data.

c.  Wholly apart from user-generated files, electronic device storage media—in particular, the internal hard drives of computers and electronic devices contain electronic evidence of how a computer or electronic device has been used, what it has been used for, and who has used it.  I gave been advised that forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and other virtual memory files. I have been advised that computer and electronic device users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary internet directory or "cache."

91. *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes

how the **SUBJECT TELEPHONE** was used, the purpose of use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **SUBJECT TELEPHONE** because:

a.  I have been advised that data on electronic devices can provide evidence of a file that was once on the electronic device but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). I have been advised that virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripheral devices, the attachment of USB flash storage devices, or other external storage media, and the times the computer or electronic device was in use. Computer and electronic device file systems can record information about the dates files were created and the sequence in which they were created.

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

39

d.  I have been advised, that the process of identifying the exact electronically stored information on an electronic device storage device, in order to draw an accurate conclusion, is a dynamic process. Electronic evidence is not always data that can be merely reviewed and passed along to investigators. Whether data stored on an electronic device is evidence may depend on other information stored on the electronic device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

92. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **SUBJECT TELEPHONE** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire device, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

93. *Manner of execution.*  Because this warrant seeks only permission to examine a device already in possession by law enforcement, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time, day or night.

### REQUEST FOR DELAYED NOTICE

94. The government requests that the Court authorize delayed notice of the attached warrant for a period of 30 days pursuant to 18 U.S.C. § 3103a.  Such delay is necessary because the government is engaged in an ongoing criminal investigation focused upon potential violations of U.S.C. § 922(g)(1), Felon in Possession of a Firearm; 18 U.S.C. §

922(d), Transfer of a Firearm to a Prohibited Person; 21 U.S.C. § 841 (a)(1), Possession

with Intent to Distribute a Controlled Substance; and 18 U.S.C. § 924(c), and Use of a

Firearm in Furtherance of a Crime of Violence or Drug Trafficking Crime, which

investigation would be compromised by the revelation of the extensive contents of the

affidavit herein submitted.

95. The information provided in this affidavit is so particular that its disclosure to the

subject of the search or to other individuals described in the affidavit would reveal aspects

of the investigation that are not known to the potential targets at this time.  Such disclosure

would likely cause the subjects of the investigation to alter their conduct to conceal their

criminal activity or to destroy evidence relevant to the investigation.  Further, the results of

the execution of the search warrant could result in information being submitted to the

Grand Jury for its consideration.

## CONCLUSION

96. Based on the abovementioned facts, there is probable cause that the **SUBJECT

TELEPHONE** contains evidence of violations of 18 U.S.C. § 922(g)(1), Felon in

Possession of a Firearm and 21 U.S.C. § 841 (a)(1), Possession with Intent to Distribute a

Controlled Substance, and 18 U.S.C. § 924(c), and Use of a Firearm in Furtherance of a

Drug Trafficking Crime, therefore, I submit that this affidavit for a search warrant

authorizing the examination of the **SUBJECT TELEPHONE** described in Attachment A

to seek the items described in Attachment B.

97. I further declare that this application involves an ongoing investigation. Disclosure

of the investigation by providing advance notice would harm the investigation by allowing

those that currently are not aware of the scope of the investigation to conceal and/or

destroy evidence. Therefore, I respectfully request that for the foregoing reasons, this Affidavit and the requested warrant be sealed until further order of the Court.

98. I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

Clay R. McCausland
Special Agent
Bureau of Alcohol, Tobacco, Firearms, &
Explosives

This affidavit was sworn to by the affiant by telephone after a PDF was transmitted by email per Crim R. 41(d)(3), on this 18th day of September 2020.

Kathleen B. Burke, U.S. Magistrate Judge